## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JOHN BARROW,<br><br>              Plaintiff,<br><br>      v.<br><br>STACEY HYDRICK, JAMES BALLI, AND WARREN SELBY, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE SPECIAL COMMITTEE ON JUDICIAL ELECTION CAMPAIGN INTERVENTION OF THE JUDICIAL QUALIFICATIONS COMMISSION,<br><br>              Defendants. | Case No. 1:24-cv-01975-MLB<br><br><br>**BRIEF IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Defendants, through counsel, respectfully submit this Brief in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

## STATEMENT OF FACTS

### I.     THE ELECTION

The Georgia Supreme Court comprises nine non-partisan seats. Justices serve for staggered six-year terms. Each Justice is either elected or, for mid-term vacancies, is appointed by the Governor and may choose to run for public

reelection.  Four seats are up for reelection in this year's general election, which is set for May 21, 2024.  Early voting began on April 29.

John Barrow is a candidate in that election, running against current Justice Andrew Pinson. Justice Pinson's is the only contested seat in the election. Barrow has centered his campaign around his apparent promise to vote for a right to abortion under the Georgia Constitution. His campaign signs say, "Vote for Choice."  Veal Decl., Ex. G..  On his campaign website, Barrow states,

> I'm running because we need Justices on the Georgia Supreme Court who will protect the right of women and their families to make the most personal family and health care decisions they'll ever make. Despite many fine qualities, it's obvious from his record that the incumbent, Justice Pinson, cannot be counted on to do that.

Veal Decl., Ex. C, https://bit.ly/4baHltz.  Similarly, in a campaign commercial, Barrow states,

> I'm running for the Georgia Supreme Court to protect our personal freedoms, including the freedom of women to make their own medical decisions, like abortion, fertility, and birth control. Politicians shouldn't be making your private medical decisions. Remember to vote in the Supreme Court race and I'll protect your rights.

Veal Decl. ¶ 12, https://www.youtube.com/watch?v=mHnZOyxsKfw.  And as a news organization reported,

> Barrow said he believes Georgians have a state constitutional right to abortion and that voters would boost their chances of

2

restoring broader access to abortion by doing something they've never done before: defeating an incumbent state justice.

Veal Decl., Ex. H, https://bit.ly/4bcLmhk.

In 2019, the Georgia General Assembly enacted H.B. 481, prohibiting abortions after a fetal heartbeat is detected. Living Infants Fair and Equality Act (LIFE Act), 2019 Ga. L. 711. Challengers have sued in state court to enjoin the law as a violation of the Georgia Constitution. *SisterSong Women of Color Reprod. Just. Collective v. Georgia*, No. 22-cv-367796 (Fulton Cty. Super. Ct. July 26, 2022). The state trial court initially held that the Act was void *ab initio* because it had been enacted before *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). When the case first reached the Georgia Supreme Court last fall, the Court overturned that ruling and remanded for the trial court to consider the challengers' state constitutional claim on its merits. *Georgia v. SisterSong Women of Color Reproductive Justice Collective*, 894 S.E.2d 1 (Ga. 2023). According to Barrow, when the case comes back up, "[i]t's the most important decision the Supreme Court of Georgia is going to make in the next 20 years." Veal Decl., Ex. E.

## II.   THE COMMISSION

Georgia's judges and judicial candidates are bound by Georgia's Code of Judicial Conduct, a set of ethics rules promulgated by the Georgia Supreme Court. *See* Ga. Code of Judicial Conduct, Preamble. Pursuant to Georgia's

3

Constitution, the Georgia General Assembly established the Judicial Qualifications Commission to enforce the Code.  Ga. Const. art. VI, § 7, ¶ VI; *see* Ga. Code § 15-1-21.  The Commission issues formal and informal advisory opinions on the meaning of the Code, and it investigates potential violations of the Code to recommend potential discipline to the Supreme Court.  Ga. Code § 15-1-21(j); *see generally* Rules of the Judicial Qualifications Commission of Georgia ("Comm'n R.").

### A.    The Commission's Composition

The Commission consists of ten appointed members, divided into two panels: a seven-member Investigative Panel and a three-member Hearing Panel.  The Investigative Panel contains: (1) one attorney appointed by the Governor; (2) two judges appointed by the Supreme Court; (3) one attorney and one citizen, appointed by the Georgia House of Representatives; and (4) one attorney and one citizen, appointed by the Georgia Senate.  Ga. Code § 15-1-21(f)(3)(A).  The Investigative Panel selects one of its members to serve as a chairperson and a non-member lawyer to serve as Director.  Comm'n R. 3(B), 4.  The members of the Hearing Panel include one citizen appointed by the Governor, as well as one judge and one attorney appointed by the Supreme Court.  *Id.* § 15-1-21(f)(4)(A); *see* Comm'n R. 2, cmt. 6.

During general election years, the Investigative Panel chairperson selects the senior judge, attorney, and citizen members of said Panel to

comprise a Special Committee on Judicial Election Campaign Intervention. Comm'n Rule 29(A). The Special Committee's job is "to deal expeditiously with allegations of ethical misconduct in campaigns for judicial office." *Id.*

## B.  The Commission's Proceedings

Matters of judicial misconduct or incapacity may reach the Commission by complaint or "other sources." Comm'n R. 17(A). Such information is typically reviewed first by the Director and then, should the Director not dismiss it, the Investigative Panel. Comm'n R. 17(B)(1)-(2). During election years, the Special Committee is authorized to work with the Director to promptly handle certain election-related complaints, which includes requiring confidential responses from the subject of complaints within three business days and conducting preliminary investigations. Comm'n R. 29(B). If the Committee determines, after a preliminary investigation, that "speedy intervention" is warranted, it may release a public statement setting out the violations "reasonably believed to exist" and/or refer the matter to the full Investigative Panel for further investigation. Comm'n R. 29(B)(4)(a)-(b).

In either case, if the full Investigative Panel finds, after a full investigation, that the judge or judicial candidate acted in violation of the Code, it may consider any of the following dispositions: dismissal; private admonition or deferred discipline agreement; the filing of formal charges; … other sanctions as provided by Rule 6(B); or resolution of the matter by the

judge's agreement to resign or retire, with or without the judge's agreement not to seek or hold judicial office in the future. Comm'n R. 17(D)(1). The Panel may not issue or impose any of these sanctions, however, without the consent of the subject judge. If the judge or candidate does not agree, the Panel may either direct the Director to dismiss the complaint or instruct the Director to file formal charges. Comm'n R. 17(D)(2).

Finally, when the Director files formal charges, the matter moves from the Investigative Panel to the Hearing Panel. The charges are served upon the subject judge and the subject judge's counsel. Comm'n Rs. 19, 20. After an answer is filed, both sides may take discovery, including conducting depositions and gathering written evidence. Comm'n R. 22. The Hearing Panel then conducts a public hearing, during which the parties are able to present evidence and cross-examine witnesses. Comm'n R. 24(C). After the hearing, the Hearing Panel, by a majority vote, may either dismiss the case or recommend a sanction to the state Supreme Court. Comm'n R. 24(D).[1]

To be clear, neither Commission Panel may impose any public discipline on a judge or judicial candidate. The Special Committee may only issue a public statement. Comm'n R. 29(B)(4). The Investigative Panel may issue a

---

[1] Contrary to Barrow's suggestion (at 5), however, disbarment of an attorney is not among the possible sanctions. Disbarment is a sanction which can only be recommended by the State Bar of Georgia. *See* Ga. Bar R. 4-201 *et seq.*; *id*. R. 4-220.

*consented-to* private admonition, deferred discipline agreement, or agreement by the judge to resign or retire.  Comm'n R. 17(D)(2).  And even after finding misconduct, the Hearing Panel may only *recommend* sanctions to the Georgia Supreme Court, which ultimately decides any discipline.  Comm'n R. 6(B).

## III.   THE PENDING INVESTIGATION

On May 1, 2024, the Director sent a confidential notice to Barrow on behalf of the Special Committee, informing him of a complaint concerning several campaign statements, including those quoted above, that violated the Code. Veal Decl., Ex. A; *see* Comm'n R. 17(C)(1).  The Special Committee alleged that Barrow made promises and commitments to vote a certain way on an issue likely to come before the Court, that he made misleading statements about the role of jurists and the current state of Georgia law, and that he acted in a manner that did not promote public confidence in the independence, integrity, and impartiality of the judiciary.  Code R. 1.2(A), 2.10(B), 4.2(A)(2)-(3).  The Special Committee requested that Barrow respond to the allegations and that he "bring all campaign-related materials, information, and advertisements into compliance with the Code." Veal Decl., Ex. A, at 4.

On May 6, Barrow filed this lawsuit and submitted a response to the Special Committee's letter.  Veal Decl., Ex. B.  Barrow informed the Special Committee that he "will continue to exercise his Constitutional rights to speak freely as a candidate for the Supreme Court of Georgia." *Id.* at 4.  He also

7

requested that the Special Committee "dismiss this complaint immediately." *Id.* On May 9, Barrow moved for a temporary restraining order and preliminary injunction "prohibiting the defendants from enforcing Georgia's Code of Judicial Conduct." Mot. 1, ECF No. 3.

## <u>ARGUMENT</u>

Barrow's request for a temporary restraining order or a preliminary injunction should be denied. Both a temporary restraining order and a preliminary injunction are "extraordinary remed[ies]." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). The requesting party must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the public interest. *Id.* at 20. Barrow's request for emergency relief fails every prong.

Barrow is unlikely to succeed on the merits of this case. Most fundamentally, this dispute is not justiciable. Barrow cannot establish any cognizable harm under Article III. Well-established abstention principles preclude interference into the Commission's pending proceedings. And similar ripeness principles likewise preclude adjudication of his constitutional claims. Moreover, even if the Court were to reach the merits, Barrow has woefully failed to establish a likelihood of success on the merits on his claim.

8

Barrow's showing on the remaining injunction factors is likewise deficient. Barrow seeks emergency relief from this Court purportedly to prevent the Commission from "limit[ing]" his speech over the final two weeks of his campaign. Mot. 22. But the Commission has no authority to limit his speech at all. Barrow's own conduct makes clear that the Commission's would-be confidential proceedings to date certainly have had no such effect. And there is no likelihood that any imminent proceedings will affect Barrow's speech or First Amendment rights in any way. Barrow therefore fails to show any impending irreparable harm. And the balance of harms counsels strongly in favor of permitting the Commission to continue unimpeded its vitally important constitutional mandate.

# I.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.

In the order setting Barrow's motion for hearing, the Court asked the parties to be prepared to address whether Barrow possesses Article III standing. In fact, this case is not justiciable on three independent grounds, and would fail on the merits in any event.

## A.   Barrow lacks Article III standing because his speech has not been chilled.

Barrow has not suffered an injury to his speech to give him standing to challenge the Code. For standing, a plaintiff "must show that: (1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly

traceable to the operation of the rules; and (3) a favorable judgment is likely to redress the injury." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010). Although the Eleventh Circuit has held that the injury-in-fact requirement is somewhat relaxed "where First Amendment rights are involved," even in that context it "cannot be ignored." *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001). Injuries to speech occur where a plaintiff is prevented from speaking or where he is "chilled from exercising [his] right to free expression" through a credible threat of enforcement of an alleged unconstitutional law. *Id.* (quoting *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)).

Barrow's speech has not been censored nor chilled. His promises remain on his campaign website, signs, and his Facebook and Instagram pages, and his commercial continues to air. The Special Committee, in its letter, requested that Barrow remove statements that violate the Code, but he has refused to change his speech in any way, making clear that he "will continue to exercise his Constitutional rights to speak freely as a candidate for the Supreme Court of Georgia" up through the election. Veal Decl., Ex. A, at 4.

Nor has Barrow shown that any censorship is likely to occur "in the homestretch of the campaign." Mot. 22. The Commission's process is still in the investigative stage, and Barrow cannot be subjected to any sanction unless and until the process is complete *and* the Georgia Supreme Court decides to impose sanctions. The most that the Special Committee can do is issue a public

10

statement about Barrow's campaign statements.  But Barrow has shown no imminent threat of such a statement, and he has already made the Special Committee's allegations public through this lawsuit.  In any event, as the Supreme Court recently held, such a reprimand to a public official by his peers does not constitute an injury to speech.  *See Hous. Cmty. College Sys. v. Wilson*, 595 U.S. 468, 479 (2022).  Barrow has not suggested that the Commission's "countervailing speech" will "materially deter[]" him "from exercising his own right to speak."  *Id.* at 477, 479. In the meantime, the investigation itself—which would have been confidential absent Barrow's suit—is not a harm to Barrow's First Amendment rights. *See Ohio Civ. Rts. Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 628 (1986) (explaining that a state administrative body "violates no constitutional rights by merely investigating the circumstances" of conduct allegedly protected by the First Amendment). Barrow has thus failed to show that he has suffered or will imminently suffer any Article III injury traceable to the Commission's actions.

### B.   *Younger* Abstention Precludes Federal Court Interference in the Commission's Ongoing Proceedings.

Even if Barrow could establish Article III standing, his request to enjoin an ongoing Commission proceeding would be foreclosed by federal abstention principles reflected in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. "*Younger* and its progeny reflect the longstanding national public policy, based

11

on principles of comity and federalism, of allowing state courts to try cases—already pending in state court—free from federal court interference." *Butler v. Ala. Jud. Inquiry Comm'n*, 245 F.3d 1257, 1261 (11th Cir. 2001).  That is true, even where the federal plaintiff alleges that ongoing proceedings threaten to stifle political speech.  *See id.* at 1265 ("We recognize the importance of protecting political speech, but . . . 'the existence of a "chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.'") (quoting *Younger*, 401 U.S. at 51)).

To determine whether *Younger* bars federal intervention into a state proceeding, the court must first determine whether it is the type of proceeding to which *Younger* can apply: "(1) 'criminal prosecutions'; (2) 'civil enforcement proceedings'; and (3) 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' judicial functions.'" *Leonard v. Ala. State Bd. of Pharmacy*, 61 F.4th 902, 907-08 (11th Cir. 2023) (citation and ellipses omitted); *see Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013).  Second, the court considers the so-called *Middlesex* factors, namely whether: (1) the state proceedings are "ongoing"; (2) "the proceedings implicate important state interests"; and (3) there exists "an adequate opportunity in the state proceedings to raise constitutional challenges." *Leonard*, 61 F.4th at 908 (quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423,

432 (1982)).  If each factor is met, *Younger* mandates that a federal court abstain from exercising jurisdiction, unless the federal plaintiff can show that "extraordinary" circumstances warrant intervention.  *Id.*; *see Juidice v. Vail*, 430 U.S. 327, 338 (1977).  Each factor is met here; no extraordinary circumstances warrant this Court's intervention.

> 1.   Younger *Abstention applies to the Commission's proceedings.*

Both the Supreme Court and the Eleventh Circuit have held that *Younger* abstention applies to state ethics proceedings of the sort here.  In *Middlesex*, the Supreme Court applied *Younger* to abstain from interfering in a New Jersey state ethics proceeding against an attorney who made derogatory public comments about a judge's temperament in an ongoing murder trial. *Middlesex*, 457 U.S. at 427-28.  The Court held that New Jersey had "an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses." *Id.* at 434.  Likewise, the Eleventh Circuit in *Butler* applied *Younger* to an ongoing state ethics proceeding before a state commission against a sitting Supreme Court of Alabama justice charged with violations of the Alabama Canons of Judicial Ethics.  *See Butler*, 261 F.3d at 1156.  Such state proceedings to enforce the State's ethics code qualify as "civil enforcement" proceedings to which *Younger* can apply.  *See Sprint*, 571 U.S. at 79-80 (citing *Middlesex*, *supra*).

2.      *The* Middlesex *factors are readily satisfied.*

Each of the *Middlesex* factors is met here.  First, the Commission's proceedings concerning Plaintiff's comments are plainly "ongoing."  The Commission is actively in the process of considering the complaint against Barrow.  Moreover, if permitted to proceed, this "federal proceeding w[ould] interfere with [that] ongoing state court proceeding." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003).  To satisfy this factor, the Eleventh Circuit looks to the "relief requested and the effect it would have on the state proceedings." *Id.*  An emergency injunction against the Special Committee of the Investigative Panel barring enforcement of the Code would presumably prevent the Committee and thus the Commission from continuing its statutorily-prescribed investigation.

Second, the Commission's proceedings concern a matter of vital interest to the State of Georgia: the public's confidence in the integrity of the judicial system.  The Supreme Court has long recognized that "States have important interests in administering certain aspects of their judicial systems." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12-13 (1987) (citing *Middlesex*, 457 U.S. 423); *see Juidice*, 430 U.S. at 335.  More specifically, in *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445 (2015), the Supreme Court recognized the State's "compelling interest in preserving public confidence in the integrity of the judiciary," 575 U.S. at 444, adding that "public perception of judicial integrity is a state

14

interest of the highest order," *id.* at 446. The Commission's efforts to investigate potential violations of the Code implicate Georgia's interest in preserving the public confidence in the integrity of its judiciary.

Third, the Commission's proceedings provide judges and judicial candidates, like Barrow, an adequate opportunity to raise constitutional objections. The preamble to the Code *requires* the Commission to consider constitutional principles in applying the Code and construe it "so as not to impinge on . . . *judges' First Amendment rights of freedom of speech and association.*" Ga. R. Code of Judicial Conduct, Preamble (emphasis added). No judge or candidate can be sanctioned without further review and determination of the Georgia Supreme Court, which can also consider constitutional objections. Comm'n Rs. 17(D), 6(B); *see Ohio Civil Rights Comm'n*, 477 U.S. at 627 ("[F]ederal courts should refrain from enjoining lawyer disciplinary proceedings initiated by state ethics committees if the proceedings are within the appellate jurisdiction of the appropriate State Supreme Court." (citing *Middlesex*, *supra*)). And, of course, if a disciplined judge or judicial candidate is unhappy with the Georgia Supreme Court's resolution of a constitutional objection, he may "seek review in [the Supreme Court] of any federal claim properly asserted in and rejected by state courts." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 605 (1975).

3.      *No exceptional circumstances warrant federal intervention.*

Finally, Barrow has not demonstrated any extraordinary circumstances in federal intervention might nevertheless be warranted. "*Younger*'s progeny have crystalized these exceptions into two broad categories: proceedings instituted in 'bad faith' and proceedings founded on 'flagrantly and patently' unconstitutional laws." *Leonard*, 61 F.4th at 911. Neither is true here.

To start, the challenged ethics rules are not "flagrantly and patently" unconstitutional. *Id.* To satisfy this standard, the challenged law must violate the constitution "'in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.'" *Younger*, 401 U.S. at 53-54 (quoting *Watson v. Buck*, 313 U.S. 387, 402 (1941)). Barrow does not contend that Rules 1.2(A), 2.10(B), and 4.2(A)(2)-(3) are wholly and inescapably unconstitutional in every application. Therefore, this rare exception to *Younger* abstention does not apply.

Nor has Barrow even alleged bad faith, much less shouldered the burden of proving it. And there is no hint that any bad faith exists here. *See, e.g.*, *Mulholland v. Marion Cty. Election Bd.*, 746 F.3d 811, 819 (7th Cir. 2014) (finding bad faith where an election board "attempt[ed] to enforce a law that a federal court ha[d] already told the Board in a judgment is unconstitutional"). The Commission is fulfilling its duty to investigate statements that may violate the state's judicial ethics requirements, as it is constitutionally and statutorily

16

required to do.  Nothing more.  *Younger* thus precludes this Court's intervention at this stage.

### C.  Barrow's challenges are not ripe.

Ripeness principles lead to a similar conclusion:  this case is not ripe for federal adjudication.  The ripeness "requirement is designed to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  For ripeness, courts consider three factors: first, "whether the courts would benefit from further factual development of the issues presented," second, "whether judicial intervention would inappropriately interfere with further administrative action," and third, "whether delayed review would cause hardship to the plaintiffs." *Id.* at 733.

All three factors are met here.  First, further factual development is warranted.  During the administrative process, the Commission is expected to detail its interpretations of the provisions of the Code at issue here—the "promises or commitments" bar, R. 2.10(B), 4.2(A)(2); the "false or misleading statement" bar, R. 4.2(A)(3); and the "public confidence" requirement, R 1.2(A). The Commission has previously had little opportunity to address the nuances

17

of these rules.  *See Pittman*, 267 F.3d at 1278-79 (noting that, before a federal court could decide if the state bar's "advisory opinion comports with the First Amendment," "an important factual issue must initially be resolved" of "what the actual policy of the [state bar] is concerning the" speech at issue).  Second, judicial intervention would interfere with the Commission's "decisionmaking process before it has the opportunity to finalize" its application of its Rules to Barrow's seven challenged statements.  *Id.* at 1278.  The Special Committee's letter contained allegations, not a final decision on any challenged statement.  Third, Barrow will suffer no "substantial hardship" from delayed review.  *Id.* at 1280-81.  His speech has not been censored, and he has not been otherwise subject to any discipline.  Plus, he "will have ample opportunity" to raise his First Amendment claims during the administrative process and in any legal challenge to that Commission's final conclusions.  *Id.* at 1281.  In short, this dispute is not "sufficiently mature" and the issues not "sufficiently defined and concrete[] to permit effective decisionmaking."  *Id.* at 1278.

### D.   Barrow has not shown a likelihood of success on the merits of his First Amendment claim.

Finally, even if the Court reached the merits of Barrow's First Amendment claim, he has not carried his burden to show that his is likely to succeed.  Each of the rules he challenges is "narrowly tailored to serve a compelling interest"—namely, the State's compelling interest in "preserving

the integrity of its judiciary and maintaining the public's confidence in an impartial judiciary." *Williams-Yulee*, 575 U.S. at 441, 442 (internal alterations and quotation marks omitted) (citation omitted).  His arguments to the contrary are unpersuasive.

1. Consider first Rules 4.2(A)(2) and 2.10(B), often referred to as "pledges or promises" clauses or "commits" clauses.  Rule 4.2(A)(2) instructs judicial candidates not to "make statements or promises that commit the candidate with respect to issues likely to come before the court that are inconsistent with the *impartial* performance of the adjudicative duties of judicial office." *Id.* (emphasis in original).  Rule 2.10(B) nearly verbatim provides that "[j]udges shall not, in connection with cases, controversies, or issues that are likely to come before the court, make promises or commitments that are inconsistent with the *impartial* performance of the adjudicative duties of judicial office." *Id.* (emphasis in original).

Both rules serve Georgia's compelling interest in preserving the integrity of its judiciary and maintaining the public's confidence in its impartiality.  The rules safeguard the public's assurance that judges will not predetermine the outcomes of cases, but will faithfully apply law to each case before them.  Both are narrowly tailored to meet this goal.  Unlike the "announce" clause the Supreme Court found impermissible in *White* because it swept too broadly, these rules target only the narrowest speech (*i.e.*, promises or commitments to

rule a certain way, once on the bench).  *See Minn. Republican Party v. White*, 536 U.S. 765, 776 (2002).

Barrow errs in equating Rule 4.2(A)(2) to an "announce" clause, which the Court struck down in *White*.  *Id.* at 770.  The *White* Court expressly distinguished an announce clause from "pledges and promises" rules of the sort presented here, explaining that an announce clause "*covers much more than promising to decide an issue a particular way.*"  *Id.* (brackets and quotation marks omitted) (emphasis added).  In Georgia, judicial candidates and judges are not forbidden from announcing their views on legal issues, but only from "promising to decide an issue in a particular way."  *Id.*; *see* Rule 4.2 cmt. [1]. Further, the prohibition applies only when the issue is likely to come before the Court and the promise is "inconsistent with the impartial performance of the adjudicative duties of judicial office."  Rules 4.2(A)(2), 2.10(B).  Such "pledges or promises" rules are not condemned by *White*.

None of the other cases Plaintiff cites supports his proposition either.  To the contrary, *Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010), *upheld* the constitutionality of a commits clause.  *See id.* at 715 ("A commits clause 'secures a basic objective of the judiciary, one so basic that due process requires it[.]'") (citation omitted).  And in *Winter v. Wolnitzek*, the Sixth Circuit *reversed* a district court's decision striking down a commits clause.  834 F.3d 681, 694

(6th Cir. 2016).[2]  Far from supporting Plaintiff's position, therefore, these cases all confirm that Barrow is unlikely to succeed in his challenge to Rules 4.2(A)(2) and 2.10(B).

2.   Rule 4.2(A)(3) provides that judicial candidates "shall not use or participate in the publication of a false statement of fact, or make any misleading statement concerning themselves or their candidacies, or concerning any opposing *judicial candidate* or candidacy, with *knowledge* of the statement's falsity or with reckless disregard for the statement's truth or falsity."  *Id.*  Again, prohibiting judges or judicial candidates from lying or recklessly disregarding the truth of a statement clearly serves Georgia's compelling interest in preserving the integrity of its judiciary.  And again, the rule prohibits only conduct that directly impinges on this compelling interest— leaving ample breathing space for fierce debate on the campaign trail.

Contrary to Barrow's suggestion (at 14-15), the Eleventh Circuit did not strike down a "substantially similar" canon in *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002).  In *Weaver*, the Eleventh Circuit held that "prohibiting false statements *negligently* made and *true statements* that are misleading or deceptive . . . d[id] not afford the requisite 'breathing space' to protected

---

[2] In *Kansas Judicial Review v. Stout*, 562 F.3d 1240 (10th Cir. 2009), the Tenth Circuit found a challenge to a commitments clause mooted by newly enacted judicial standards.  *Id.* at 1244.

speech." *Id.* at 1319 (emphasis added).  By contrast, Georgia Rule 4.2(A)(3) applies only to a false or misleading statement and only where the speaker *knows* the statement is false or has *reckless disregard for the truth* of the statement.  This heightened intent requirement (akin to "actual malice") is exactly what was missing in *Weaver* and now narrowly tailors this rule to conform to constitutional requirements.  Indeed, the Eleventh Circuit stated such explicitly: "to be narrowly tailored, restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false—*i.e.*, an actual malice standard."  *Id.* at 1319.

Barrow takes issue with the Rule's inclusion of "misleading" statements.  Mot. 16-17.  But Rule 4.2(A)(3) punishes only misleading statements that are made with *knowledge* of their falsity or with *reckless disregard* as to their truth.  The rule therefore does not prohibit any "true statements."  Mot. 16.  And thus neither *Weaver* nor *Winter* condemn it.  *See Weaver*, 309 F.3d at 1320 (holding that candidates must not be prohibited from speaking with "a good faith belief that what they would otherwise say is truthful"); *Winter*, 834 F.3d at 694 ("[A] ban on conscious falsehoods satisfies strict scrutiny.").

3.    Lastly, Rule 1.2(A) provides that judges and judicial candidates "shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary."  Barrow argues this

rule is "entirely duplicative of the other alleged violations" as applied in this case.  Mot. 19.  For that reason, it passes constitutional muster for all the reasons stated above.  In any event, the Rule mirrors nearly word-for-word the compelling state interest the Supreme Court recognized in *Williams-Yulee*.

4.   Beyond attacking the constitutionality of the rules themselves, Barrow briefly takes issues with the application of those rules to his campaign speech identified in the Special Committee's notice.   Any such attack is premature at this stage, when the rules have not yet actually been applied to Barrow's speech; the Commission has *alleged* violations, but has made no final findings in its investigation.  Either way, the specific application of these rules to Barrow's speech would survive strict scrutiny. The State has a compelling interest in maintaining the public's confidence in an *impartial* judiciary by prohibiting judicial candidates from committing to vote a certain way in cases likely to come before them.  Barrow appears to have committed that, if elected, he will vote to recognize a right to abortion in the Georgia Constitution—an issue that has a high probability of ending up before the Georgia Supreme Court in a currently pending case.  At the very least, the application of the Code to the challenged speech is not so clearly barred by the First Amendment as to justify an injunction precluding the Commission's investigation into whether any violation has occurred and, if so, any sanction warranted.

## II.    PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM.

Barrow has not shown a substantial likelihood that he would suffer irreparable injury absent an injunction. Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Although the unconstitutional abridgement of speech can be irreparable harm, *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006), no speech has been abridged here, nor is any abridgment imminent. Injunctive relief can be denied on this basis alone. *See Siegal*, 234 F.3d at 1176.

Barrow suggests that the Commission "threaten[s] to limit [his] campaign speech in the homestretch of the campaign." Mot. 22. But the Commission has simply initiated an investigation and administrative process will take, at minimum, several months. Veal Decl. ¶ 8. In the meantime, the Special Committee can issue a public statement of its own, but it has not and cannot singlehandedly limit Barrow's speech prior to the election. Indeed, Barrow's speech has continued undeterred. His promises remain on his campaign website and Facebook page. And he has not suggested that he intends to self-censor any speech between now and the election on May 21. To the contrary, he has made clear to the Commission that he "will continue to exercise his Constitutional rights to speak freely as a candidate for the Supreme Court of Georgia." Veal Decl., Ex. B.

III.   **THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.**

Finally, Barrow has not shown that the balance of equities or the public interest tip in favor of enjoining the Commission's proceeding.  Because the State of Georgia is the opposing party, these two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Georgia and its citizens will suffer grave harm if the Commission is prohibited from continuing its administrative process. Judicial "codes of conduct serve to maintain the integrity of the judiciary and the rule of law," and these codes are "the principal safeguard against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation's elected judges."  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (internal quotation marks omitted). Georgia thus has an "interest of the highest order" in investigating alleged violations of its Judicial Code.  *Williams-Yulee*, 575 U.S. at 446 (quoting *Caperton*, 556 U.S. at 889).  "Judges are not politicians, even when they come to the bench by way of the ballot," and "[a] State may assure its people that judges will apply the law without fear or favor."  *Id.* at 437.

## <u>CONCLUSION</u>

For the foregoing reasons, the motion for a temporary restraining order or preliminary injunction should be denied.

Dated: May 13, 2024                    */s/ M. Laughlin Allen*

Cheryl Haas
(Ga. Bar No. 316081)
M. Laughlin Allen
(Ga. Bar No. 901999)
McGuireWoods LLP
1075 Peachtree St. N.E.
35th Floor
Atlanta, GA 30309
*chaas@mcguirewoods.com*
(404) 443-5726

Jonathan Y. Ellis
(*pro hac vice* pending*)*
McGuireWoods LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
(919) 755-6688
*jellis@mcguirewoods.com*

Katherine C. Richardson
(*pro hac vice* pending*)*
McGuireWoods LLP
201 N. Tryon Street
Suite 3000
Charlotte, NC 28202
(704) 373-8848
*krichardson@mcguirewoods.com*

Grace Greene Simmons
(*pro hac vice* pending*)*
McGuireWoods LLP
888 16th St. NW
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 828-2833
*gsimmons@mcguirewoods.com*

## CERTIFICATE OF COMPLIANCE

I certify that, as set forth in Northern District of Georgia Local Rule 5.1(B), this Brief has been prepared using Century Schoolbook 13-point typeface.

_/s/ M. Laughlin Allen_