## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

John Barrow,

          Plaintiff,

                       Case No. 1:24-cv-1975-MLB

v.

Stacey Hydrick, et al.,

          Defendants.

_____/

## <u>OPINION & ORDER</u>

Plaintiff John Barrow—a candidate for Justice of the Supreme Court of Georgia—sued members of the Special Committee on Judicial Election Campaign Intervention ("Special Committee") of Georgia's Judicial Qualifications Commission ("JQC"). (Dkt. 1.) He moves for a temporary restraining order and preliminary injunctive relief, asking the Court to enjoin the Special Committee from proceeding with an investigation into some of his campaign statements. (Dkt. 3.) Defendants oppose. (Dkt. 19.) The Court dismisses Plaintiff's complaint without prejudice for lack of standing and denies his motion for a temporary restraining order and preliminary injunction as moot.

## I.      Background

### A.      Georgia's Judicial Election Oversight

Georgia's Supreme Court Justices are elected by popular vote to six-year terms in non-partisan elections.  Ga. Const., art. VI, § 7, ¶ I. Those justices (and all other judges and judicial candidates in Georgia) are bound by Georgia's Code of Judicial Conduct (the "Code"), a set of ethics rules established by the Georgia Supreme Court.  Canon 4 of the Code states that "judges shall refrain from political activity inappropriate to their judicial office."  The JQC enforces the Code.  Ga. Const., art. VI, § 7, ¶ VI; O.C.G.A. § 15-1-21.  It consists of ten members, divided into a seven-member Investigative Panel and a three-member Hearing Panel.  O.C.G.A. §§ 15-1-21(3), (4).  During general election years, the chairperson of the Investigative Panel selects three of its members to serve on a Special Committee that monitors judicial elections and "deal[s] expeditiously with allegations of ethical misconduct in campaigns for judicial office."  Ga. R. Jud. Qual. Comm'n 29(A).

The Director of the JQC screens all complaints or allegations of judicial misconduct to determine "whether the [JQC] has jurisdiction and whether the information would constitute judicial misconduct or

2

incapacity if true." *Id.* R. 17.  Upon receipt of any complaint "facially indicating a violation by a judicial candidate of any provision of Canon 4 . . . during the course of a campaign," the Director forwards the information to the Special Committee.  *Id.* R. 29(B).  The Special Committee has limited authority.  It can conclude further investigation is necessary and tell the Director to request a "confidential written response" from the subject of the complaint.  *Id.* R. 29(B)(4).  After reviewing the written response, the Special Committee can determine the allegations warrant "speedy intervention."  *Id.*  In that case, the Special Committee may issue a "non-confidential Public Statement" to the complainant and the subject of the complaint "setting out the violations reasonably believed to exist."  *Id.*  It can also refer the matter to the Investigative Panel for further action.  *Id.*  On the other hand, the Special Committee also has the authority to determine the allegations *do not* warrant speedy intervention and, instead, warrant dismissal or referral to the Investigative Panel.  *Id.*

If the Investigative Panel determines, after a full investigation, that a judge or judicial candidate violated the Code, it may consider various actions, including (among other things) dismissal, private

admonition, the filing of formal charges, referral to an appropriate agency, or resolution by agreement with the judge. *Id.* R. 17(D)(1)(a)–(g).[1] The Investigative Panel, however, cannot impose any of these sanctions without the judge's consent. *Id.* R. 17(D)(2)(a). If the judge does not agree to a resolution, the Investigative Panel may either direct the Director of the JQC to dismiss the complaint or instruct the Director to file formal charges. *Id.* R. 17(D)(2)(b)–(c). The Hearing Panel presides over any formal charges. Both parties can conduct discovery (including taking depositions, the disclosure of potential witnesses, and an exchange of written evidence) and participate in a public hearing during which they can present evidence and cross-examine witnesses. *Id.* Rs. 22, 24(C). The Hearing Panel then dismisses the case or recommends sanctions to the Georgia Supreme Court. *Id.* R. 24(D).

### B.   Plaintiff's Judicial Campaign

Defendants Stacey Hydrick, James Balli, and Warren Selby serve on the Special Committee for the 2024 general election. (Dkt. 1 at ¶ 6.)

---

[1] Plaintiff says disbarment is a possible sanction. As Defendants point out, only the State Bar of Georgia can recommend disbarment. *See* Ga. Bar R. 4-201 *et seq.*; *id.* R. 4-220.

On May 1, 2024, the Director of the JQC sent Plaintiff a confidential letter telling him a complaint had been filed against him for statements he made during his campaign. (Dkt. 1-1 (notice letter).) The letter focuses on several statements Plaintiff made (in campaign commercials or elsewhere) essentially announcing his belief that the Georgia Constitution includes a right to privacy that protects a woman's right to an abortion, that he will protect that right if elected to the Georgia Supreme Court, and that his opponent cannot be trusted to do so. (*Id.* at 1–4.) In the confidential letter, the Director alleges Plaintiff violated various provisions of the Code by promising to vote a certain way on issues likely to come before the Georgia Supreme Court, making misleading statements about the role of jurists and the current state of Georgia law, and acting in a manner that did not promote public confidence in the independence, integrity, and impartiality of the judiciary. (*Id.*) The Director explains that the Special Committee has asked Plaintiff to file a written response and to "immediately bring all campaign-related materials, information, and advertisements into

compliance with the Code and any applicable JQC formal advisory opinions." (Dkt. 1-1 at 4 (emphasis in original).)

On May 6, 2024, Plaintiff filed a verified complaint against the members of the Special Committee (in their official capacities). (Dkt. 1.) He seeks a declaratory judgment that the JQC's application of certain Code provisions to his campaign statements violates his First and Fourteenth Amendment rights. (*Id.* at 9.) Several days later, Plaintiff moved for a temporary restraining order and preliminary injunction, asking the Court to enjoin the Special Committee from proceeding with an investigation into his campaign statements. (Dkt. 3 at 24.) The Court set a hearing for May 13, 2024, and asked the parties to discuss whether Plaintiff has standing to bring his claim. (Dkts. 4, 25.)

## II.   Legal Standard

To obtain injunctive relief, a plaintiff must show (1) "a substantial likelihood of success on the merits," (2) a substantial threat he or she "will suffer an irreparable injury unless the injunction is granted," (3) "the harm from the threatened injury outweighs the harm the injunction would cause the opposing party," and (4) "the injunction would not be adverse to the public interest." *Dream Defs. v. Governor of Fla.*,

57 F.4th 879, 889 (11th Cir. 2023) (internal quotation marks and citation omitted).    Before determining whether Plaintiff has satisfied these requirements, however, the Court must determine whether Plaintiff has standing to bring this case such that the Court has jurisdiction and, if so, whether the Court should abstain from exercising that jurisdiction.

### III.  Standing

Under Article III of the United States Constitution, a federal court's jurisdiction is limited to "Cases" and "Controversies."  U.S. Const., art. III, § 2.  "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014).  At issue here is the first requirement: injury in fact.  This requirement ensures that a plaintiff has a "personal stake in the outcome of the controversy."  *Id.* at 158.  To meet this first requirement, an injury must be "concrete, particularized, and actual or imminent."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Plaintiff did not address standing in his complaint or his motion for a temporary restraining order.  At the hearing, Plaintiff argued he has

standing because the Special Committee could issue a public statement critical of him and because the JQC's threat of prosecution chills his First Amendment rights.  Defendants argue Plaintiff lacks standing.  (Dkt. 19 at 9–11.)

### A.    Public Statement

The possibility the Special Committee might make a public statement does not confer standing on Plaintiff under these facts. *Driehaus*, 573 U.S. at 157–58.  As explained, if the Special Committee determines speedy intervention is appropriate, it has the authority to "release to the complainant and the subject of the complaint a non-confidential Public Statement setting out the violations reasonably believed to exist."  Ga. R. Jud. Qual. Comm'n 29(B)(4).  So the statement can only identify violations the Special Committee reasonably believes to exist.  The problem for Plaintiff is that—upon receipt of a confidential letter from the Director of the JQC setting forth allegations that many of his statements and advertisements violate various provisions of the Code—he chose not to keep the allegations confidential but rather publicized them by filing this lawsuit and attaching the confidential letter.  (Dkts. 1; 1-1.)  He could have filed his complaint (and his motion

seeking injunctive relief) under seal.  But he decided not to do so.  He chose to announce the allegations against him.

Plaintiff argues a public statement from the Special Committee would say something *more* about judicial misconduct than what he disclosed.  He presents no evidence of this.  By rule, the Special Committee can only set out the violations reasonably believed to exist. The letter Plaintiff published already contains the Director's assessment that the information in the complaint—if true—constitutes judicial misconduct.  Ga. R. Jud. Qual. Comm'n 17.  She also provided detailed reasoning for her assessment.  And Plaintiff hasn't suggested he did not make the statements at issue.  So it really is the same thing.  Moreover, at the hearing on Plaintiff's motion for injunctive relief, Plaintiff introduced a campaign statement from his opponent in which the opponent asserted that "this week we learned that the Georgia Judicial Qualification Commission notified my opponent that he is **facing charges for numerous violations** of the Code of Judicial Conduct for making misrepresentations and campaign promises about how he would rule."  (Dkt. 30-1 at 1 (emphasis in original).)  Plaintiff's opponent also stated that "instead of answering the charges, [Plaintiff] sued in federal

court to block the Commission and apparently intends to **keep violating the ethics rules.**" (*Id.* (emphasis in original).) Plaintiff's opponent could not have said these things if Plaintiff had not gone public with the JQC's letter. Without considering whether the opponent's campaign statement is technically accurate, the point is that, because of Plaintiff's decisions, the fact the JQC has alleged Plaintiff violated state ethics rules is well in the public domain. The details of the allegations, the Director's analysis, the instruction that he stop the violations, and his alleged intention to "keep violating the ethics rules" are all out in the public because of Plaintiff's actions.

Plaintiff suggests the JQC could be harsher on him in a subsequent statement. In *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002)—a case cited by Plaintiff—the JQC (having found that a judicial candidate had violated a previously issued cease-and-desist order) issued a public statement to the media, saying the candidate had "'intentionally and blatantly' violated the original cease and desist request and deliberately engaged in 'unethical, unfair, false and intentionally deceptive' campaign practices." *Id.* It did so under specific rules that allowed the Special Committee to take that action under those circumstances. *Id.* Those

10

rules no longer apply.  As already explained several times, the current rule merely permits the Special Committee to set out the violations reasonably believed to exist.  The rule does not authorize any further commentary, criticism, or analysis by the Special Committee.  And Plaintiff has not shown the Special Committee is likely to breach its own rules or go overboard in any statement it might make.

Plaintiff also says a public statement would be harmful because it would cloak the allegations in the JQC's authority.  The Court is not convinced.  The letter—signed by the Director, on JQC letterhead, and repeatedly stating that Plaintiff's various statements "violate the following [Code] provisions"—already does that.  (Dkt. 1-1 at 1–5.)

In the light of the allegations Plaintiff published and the further discussion he caused, the Court concludes Plaintiff does not face any threat of injury from a potential statement by the Special Committee.

**B.    Threat of Prosecution**

Plaintiff also argues he can establish an injury in fact because he is subject to prosecution for exercising his First Amendment rights.  He did not raise this issue in his complaint or his motion for a temporary restraining order.  But at the hearing, he argued that "when you're

talking about threatening a prosecution against someone, what you're doing is chilling their free speech rights" and that he needs injunctive relief "to keep the [JQC] from violating or chilling [his] first amendment rights." (May 13 Hearing Tr. at 8, 11.)

An allegation of future injury may suffice for standing "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Driehaus*, 573 U.S. at 158. "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.* So in the First Amendment context, "where the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017). The Eleventh Circuit applies a two-part test to determine whether such a person has standing to bring a pre-enforcement suit.[2] First, a plaintiff must allege self-censorship, that is, an unacted upon "intention to engage in a course of conduct arguably

---

[2] That the JQC has already begun its investigation does not (by itself) preclude Plaintiff from alleging a threatened injury sufficient to establish standing, as he is still in the midst of the election and thus could (but has not) allege chilling of his ongoing speech.

affected with a constitutional interest, but proscribed by a statute." *Id.*
Second, the plaintiff must allege there "exists a credible threat of
prosecution." *Id.*

Plaintiff fails at the first step. Plaintiff argued in his motion that
the Special Committee's actions "threaten to limit [his] campaign speech
in the homestretch of the campaign." (Dkt. 3 at 22.) Plaintiff has not
actually alleged, however, self-censorship. He has not claimed he intends
to exercise his First Amendment rights but is not doing so for fear of
prosecution by the JQC. Indeed, the evidence shows just the opposite:
that Plaintiff is determined to continue saying the things he wants to say
about his views on abortion rights and his commitment to defending
those rights. Defendants presented evidence, for example, that in a
written response to the JQC, Plaintiff insisted he "will continue to
exercise his Constitutional rights to speak freely as a candidate for the
Supreme Court of Georgia." (Dkt. 21 at 11.) Defendants also presented
evidence that, despite the JQC's request in the May 1 letter that he bring
all campaign materials into compliance (or what the JQC claims to be
compliance), Plaintiff has not removed any of the statements from his
campaign website, continues to make available on YouTube an

advertisement that includes his commitment to protect a woman's right to an abortion, has statements on his personal and his campaign's Facebook pages that he is running for the Georgia Supreme Court to protect a woman's right to make her own medical decisions (including as to an abortion), and has placed yard signs stating that a vote for him is a "vote for choice."  (Dkts. 20-1; 20-2; 20-3; 20-4; 20-5; 20-6.)

When the Court pointed this problem out to Plaintiff, he did not offer any evidence he is being chilled from exercising his First Amendment rights because of the JQC's actions or threatened actions. His attorney argued Plaintiff "might have had additional things that he was going to say that were chilled[.]"  (May 13 Hearing Tr. at 39.)  But he presented no evidence of that.  No testimony, no affidavit, nothing. Absent evidence the JQC's actions are impacting or chilling Plaintiff's First Amendment rights, Plaintiff fails to establish standing.  *See Wollschlaeger*, 848 F.3d at 1305 (evidence "but for" the challenged state action the plaintiffs "would engage in speech arguably protected by the First Amendment" sufficient to satisfy the first prong of standing analysis); *Parker v. Jud. Inquiry Comm'n of Ala.*, 2017 WL 3820958, at *5 (M.D. Ala. Aug. 31, 2017) (finding plaintiff had standing where he

alleged judicial canons "force[d] him to engage in self-censorship of his desired speech as a sitting judge").

## IV.   *Younger* Abstention

Even if Plaintiff could establish standing, the Court would decline to exercise jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971).  The *Younger* abstention doctrine "requires a federal court to abstain where a plaintiff's federal claims could be adjudicated in a pending state judicial proceeding." *Tokyo Gwinnett, LLC v. Gwinnett Cnty., Ga.*, 940 F.3d 1254, 1267 (11th Cir. 2019).  "This doctrine rests on notions of federalism and comity and the desire to avoid duplicative proceedings." *Id.*  "*Younger* abstention applies only in three 'exceptional circumstances': (1) 'ongoing state criminal prosecutions,' (2) 'certain civil enforcement proceedings,' and (3) 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id.*  "When one of those circumstances exists, a court must consider the conditions set out in *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982), to determine whether abstention is warranted." *Tokyo Gwinnett*, 940 F.3d at 1268.  "The three *Middlesex* factors are whether: (1) there is an ongoing state-court proceeding at the time of the

federal action; (2) the state proceeding implicates an important state interest; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Id.*

The regulation of judicial ethics furthers Georgia's ability to perform its judicial functions. *Tokyo Gwinnett*, 940 F.3d at 1267. So the Court must consider the *Middlesex* factors. As for the first factor, the Court finds that there is an ongoing state judicial proceeding. *See Parker v. Jud. Inquiry Comm'n of the State of Ala.*, 212 F. Supp. 3d 1171, 1179–82 (M.D. Ala. 2016) (finding an ongoing state proceeding where Alabama's Judicial Inquiry Commission had started an investigation but had not yet filed an official complaint against the judge). Plaintiff argued there is no ongoing state judicial proceeding because the Special Committee has not yet referred the complaint to the Investigative Panel. But "state proceedings, whether judicial or administrative, are considered 'ongoing' from the very beginning of the process until the end, as long as the final decision is reviewable by the state court system." *Id.* at 1182. The JQC proceeding may be in its infancy, but it has begun. As for the second factor, Georgia has an important interest in regulating the

conduct of state judges.  *Id.* at 1178 ("The ethical conduct of state court judges being integral to the administration of any state judicial system, the court finds that enjoining the enforcement of state judicial ethics canons would unduly interfere with legitimate state activities.")  As for the third factor, it appears Plaintiff could raise his First Amendment claims if the Director of the JQC files formal charges.  *Tokyo Gwinnett*, 940 F.3d at 1267; Ga. Rs. Jud. Qual. Comm'n 22, 24(C).  Accordingly, even if Plaintiff could establish standing, the Court would abstain from exercising jurisdiction.

## V.    Conclusion

The Court **DISMISSES** Plaintiff's complaint without prejudice for lack of standing and **DENIES AS MOOT** Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction (Dkt. 3).  The Court **GRANTS** Defendants' Motion to Seal Certain Exhibits Containing Confidential Information (Dkt. 22) and **DIRECTS** the Clerk to seal Exhibits A and B to the Declaration of Courtney Veal (Dkt. 21).  The Court **DIRECTS** the Clerk to close this case.

**SO ORDERED** this 16th day of May, 2024.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE